Moncure, J.
The will of Robert Crawford imposed a charge on the estate given to his wife for the keeping, raising and schooling óf his children. The estate was of the annual value of three or four hundred dollars; and seems to have been not more than adequate to the support of the family in a plain and comfortable manner.' At the testator’s death the family consisted, besides the widow, of seven'children, ranging from four to seventeen years of age. The widow having accepted 'the estate, took it of course cum onere; and was bound to keep and raise the children, and give them sufficient schooling. Had she turned the appellee away from home when of tender years, and unable to provide for herself, and failed to provide her with necessary board, clothes and schooling, she fvould have been liable, in equity at least, if not at law, ‘for the value of such necessaries to any person who might furnish or pay for them. But she did not turn the appellee away. She kept her until she was thirteen years of age, when the appellee went to live with her aunt Mrs. Bell, by the *371 latter’s invitation, and continued to live there for three or four years, and she then lived with her aunt Mrs. Craig for a year or more until her marriage. widow, as she alleges in her answer, would have continued to keep the appellee according to the terms of the will; but she believed, and was well warranted in believing, that it would be fpr the advantage of the appellee to live with her aunt; and that she would be better provided for there than at home, and free of charge. The account which was the cause of this suit, being exhibit B filed with the bill, is for cash paid by the executor John Poage to and for the appellee while she lived with Mrs. Bell and Mrs. Craig; a large part of it having been paid to James Bell the husband of the former. It was not created at the instance of the widow, or on her credit, and she never assumed its payment. It does not appear to have been ever demanded of her, or that she was ever informed of its existence, until the institution of this suit. She was therefore never liable for the amount of the account or any part of it, at law or in equity, either by reason of the charge created by the will of her husband, or by any contract, express or implied. The case, in principle, is very much like that of Urmston v. Newcomen, 4 Adol. & Ell. 899, 31 Eng. C. L. R. 222. There, a grand mother offered to a father to take care of his child without putting him to any expense; upon which he gave up the child to her. Afterwards the grand mother gave up the child to the mother, who was living apart from the father; and afterwards the child, to eseape cruel treatment, returned to the grand mother, who maintained it thenceforward. In the argument of the case, (which was an action of assumpsit brought by the grand mother against the father to recover the expense of maintenance after the return of the child,) the general question was raised, Whether a father, if he desert his child, be not liable in assumpsit *372 to any one who provides food and clothing for it? The judges declined giving an opinion upon the gene-question, thinking that it did not arise in the case. But they all concurred in deciding that the father, who 110 notice of the child’s quitting the grand mother at all, or of the cruelty, was not liable to her for the maintenance, in as much as the facts did not show any desertion of the child by the father, and negatived a contract between him and the grand mother. They also decided that it made no difference that the grand mother, when she made the original undertaking, was a married woman; the ground of the decision being not that she had made a valid contract, but that the circumstances negatived desertion; and that therefore the question as to the implied liability did not arise.
The widow, in this case, not being liable originally for the account or any part of it, cannot be rendered liable to the executor John Poage in consequence of its payment by him; nor to the appellee in consequence of its payment by her husband to the said executor ; neither of such payments having been made at the request of the widow, express or implied.
But even if she were ever liable for this account, or any part of it, or any of the expenses of the appellee while she lived with her aunts, such liability had ceased to exist in June 1847, when the suit was revived against the appellant as executor. The widow answered the bill in June 1822, stating the facts, and denying her liability. In June 1823 an order was made for the settlement of the account of the executors of Robert Crawford. In March 1824 the commissioner’s report was returned, showing a balance due by the plaintiffs Patterson and wife to the executors on the 30th of June 1821, of thirty-eight dollars and thirty and seven-eighth cents, after charging the former with the amount of the said account marked exhibit B, which charge the commissioner stated that *373 he conceived to he justified by the answers of the executors and of the widow. There was no exception to this report. In May 1824, the cause was set hearing: And no further order was taken in it June 1847; when the widow, the acting executor, and several of the other parties having died, the cause was revived and proceeded in to a final decree, which was rendered in November 1849. I think that the bill should have been dismissed as to the appellant, not only on the grounds of defence relied on in the answer of the widow, but also on the additional grounds relied on in the answer of the appellant her executor, filed in December 1848, to wit, the staleness of the demand and the statute of limitations, and the acquiescence of the appellee in the report of the commissioner for more than twenty years, and until after the death of all the parties who were personally cognizant of the transactions. The death of the plaintiff John C. Patterson was suggested in June 1823, and the suit was thereafter prosecuted in the name of his surviving wife the appellee, who has ever since been free from legal disability. Her extraordinary laches in the prosecution of the suit has not been sufficiently accounted for. The only excuse relied on is furnished by a statement made in the answer of the appellant, that in consequence of a paralysis with which Chancellor Brown was afflicted about the time the commissioner made his report, and which in a great measure disabled him from attending to business, no action was taken by the court on the report; and that Chancellor Taylor, who succeeded Chancellor Brown in 1826, was for some years before his transfer to the Botetourt circuit, almost incapable, from indisposition, of attending to his official duties. But this excuse accounts for comparatively a small portion of the long lapse of time between the return of the report and the revival of the suit, and is wholly insufficient. *374 The fair' presumption from the record is that all the Pai'fies acquiesced in the report, and did not choose to the case any farther; especially the appellee, w^° aPPearec"l by the report to be a debtor. This presumption is confirmed by the fact, also stated in the 'answer of the appellant and admitted to be true by the counsel for the appellee, that after Chancellor Taylor came into office, but at what precise period does not appear, he filed in the papers a memorandum in the following words: “ The report not being excepted to is affirmed, and a decree to, be entered in pursuance thereof.” Though such a decree was never actually entered, yet the rights of the parties seem to have been considered as settled by the report, sanctioned qs it was by t]ie chancellor. The further prosecution of the suit having been delayed for twenty-three years, and until after the death of the widow and of the acting executor, who were acquainted with the transactions, it was too late then to revive it against their representatives, who were ignorant of them, and had not the means of making a proper defence. The case falls within the principle of the cases ■of Hercy v. Dinwoody, 2 Ves. jr. 87, and Hayes v. Goode, 7 Leigh 452; that in a court of equity it is not only required that claims should be brought forward in a reasonable time, but also that they shall be prosecuted with reasonable diligence.
I think the bill should have been dismissed, not only as to the appellant, but as to the other defendants also; and on the principle of the cases just cited. The executors of Robert Crawford had certainly no right as such to make the payments charged in exhibit 33; and John C. Patterson was not bound to have given them credit for the amount in the settlement of his wife’s portion of their testator’s estate. He did, however, give them a receipt therefor as so much of the said portion. Whether the receipt was given under *375 such mistake of law or fact, or whether the relations between them were such as to have entitled him to set aside' the transaction if due diligence had used in the prosecution of the suit, are questions which it is unnecessary to decide.
... That the suit was not prosecuted with due diligence, has already been sufficiently .shown. It may be said that none of the defendants have appealed from the decree except the appellant. But I think his appeal brings up the whole case; on the ground that the reversal of the decree and dismission of the bill as to him would, directly or incidentally, disturb the rights of the other defendants as settled by the decree.
See Dickenson v. Davis, 2 Leigh 401, and the opinion of Stanard, J. in Powell's ex’ors v. White, 11 Leigh 309, 317. The decree was, primarily, against the appellant ; but liberty was reserved to the appellee, if the decree against the appellant should prove unavailing, to apply for further relief against the executors of Robert Crawford, or any other person liable in the premises, either primarily or eventually. The executors, if they could appeal from such a decree, may not have thought it necessary to do so; as it was primarily against the appellant, and would probably have been effectual but for his appeal. The reversal of the decree, and dismission of the bill as to him, therefore, would materially disturb their rights as settled by the decree, if in fact it settled anything as to them. But the reservation is a mere incident of the decree, and the reversal of the decree would leave nothing to sustain the incidental reservation. The same may be said of the liberty reserved to the other residuary legatees of Robert Crawford to apply for decrees upon the report, although the court was of opinion, and rightly so, that they had been satisfied. 'Patterson and wife were the only plaintiffs in the suit, and it is obvious they never would have brought it but for-the .purpose *376 of recovering the amount of the account for which he given a receipt to the executors. None of the residuary legatees have ever complained of the ^editors, or asked for any decree against them. The report of the commissioner returned in 1824, showed . that payments had been made by the executors to all of them, in regard to some exceeding, and to others falling short of, their respective portions of the estate. After the return of that report the executors proceeded to settle with the legatees accordingly; and receipts in full of several of the balances have -actually been filed in the papers of the suit. In consideration of all the circumstances, and especially of the -great lapse of time, I think no such reservation should have been made in favor of the other residuary legatees.
I am therefore of opinion that the decree should be reversed, and the bill dismissed; with costs to the appellant, both in this court and the Circuit court.
The other judges concurred in the opinion of Moncure, J.
Decree reversed.